1        UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                  CHARLOTTE DIVISION

3
     UNITED STATES OF AMERICA,     ) DOCKET NO. 3:12-cr-68
4                                  )
              vs.                  )
5                                  )
     JONATHAN D. DAVEY,            )
6                                  )
              Defendant.           )
7     _____)

8
                TRANSCRIPT OF SENTENCING HEARING
9         BEFORE THE HONORABLE ROBERT J. CONRAD, JR
               UNITED STATES DISTRICT COURT JUDGE
10                   JANUARY 15, 2015

11

12

13   APPEARANCES:

14   On Behalf of the Government:

15        KURT W. MEYERS, ESQ.,
          MARK T. ODULIO, ESQ.,
16        Assistant United States Attorneys
          227 West Trade Street, Suite 1700
17        Charlotte, North Carolina 28202

18

19   On Behalf of the Defendant:

20        DIANNE KATHRYN JONES MCVAY, ESQ.,
          4303 N. Central Expressway
21        Dallas, Texas 75205

22

23                LAURA ANDERSEN, RMR
                  Official Court Reporter
24             United States District Court
                 Charlotte, North Carolina
25

1              P R O C E E D I N G S

2         (Court called to order at 9:45 a.m.)

3         THE COURT:  Good morning everyone.

4         ALL COUNSEL:  Good morning, Your Honor.

5         THE COURT:  We're here in the matter of United

6    States V Jonathan Davey for sentencing.

7         Mr. Davey was found guilty by a jury on February 8,

8    2013.  And after that his case was referred to the Federal

9    Probation Department for the purpose of preparing a

10   presentence report.

11        Mr. Davey, if you would please stand I have a few

12   questions for you concerning the presentence report.  I've

13   received it and reviewed it.  Have you had a chance to read

14   the presentence report?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  Do you believe you understand it?

17        THE DEFENDANT:  I believe so.

18        THE COURT:  And have you had enough time to go over

19   the presentence report with your attorney?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  All right.  You may sit down.

22        Ms. McVay, I'll be glad to hear from you on any

23   objections you have to the presentence report.  And keep in

24   mind as you tell me about them that I have reviewed the

25   written filings, but I'll be glad to hear from you on any

1    amplification of those objections at this time.

2          MS. McVAY:  Your Honor, we stand on the written

3    objections that we have placed in the presentence report.  We

4    think we've, in detail, outlined our objections.

5          THE COURT:  All right.  Thank you.

6          Then with respect to them -- I'll go through them,

7    make rulings, and then I'll be glad to hear from either side.

8    Does the government stand on their written responses as well?

9          MR. MEYERS:  Yes, sir.

10          THE COURT:  If I miss anything, we'll go back and

11    I'll pick them up.

12          With respect to the objections to the offense

13    conduct provisions set forth in paragraphs 5 through 26, I

14    have reviewed the offense conduct and compared it to my own

15    recollection of the evidence, as well as the trial transcript,

16    and I find that the offense conduct set forth in the

17    presentence report comports with my own recollection of the

18    evidence.  And I'll overrule the general objection to the

19    information that is contained in paragraphs 5 through 26.

20          With respect to the objections concerning

21    restitution set forth in paragraphs 27 through 87, I'm going

22    to overrule the objections.  I believe that the restitution

23    amounts set forth in the presentence report have been

24    established by the government.  To the extent that there are

25    funds available to offset the total amount of restitution,

1    those will be applied in the restitution process.  And any

2    restitution order of the Court will limit the recovery of

3    restitution by victims to the amounts of their loss so that if

4    there are funds to be applied to the restitution amount, the

5    defendant's liability for that amount will be so limited.

6           With respect to the obstruction of justice

7    enhancement, I will ask to hear from the government with

8    respect to what it believes is the factual basis for the 3C1.1

9    obstruction enhancement.

10          MR. MEYERS:  Thank you, Your Honor.  If I may use

11   the ELMO.

12          THE COURT:  You may.

13          MR. MEYERS:  Your Honor, Government's Exhibit --

14          MS. McVAY:  Your Honor, I'm sorry.  Our's is not

15   on -- there it is.

16          THE COURT:  All right.

17          MR. MEYERS:  Your Honor, Government's Exhibit S1 is

18   an email from the defendant to his victims, and it is dated

19   February 26, 2011.  It is highlighted in part.  And what the

20   Court will see from reviewing this exhibit is that the

21   defendant emailed his victims.  And this is one example of his

22   communication.  And he told them that they should report to

23   the probation office that only 12 percent of the loss

24   submitted by the probation office should be listed on the

25   forms that they returned to the probation office.  And he said

this because -- he said, according to the defendant, that
Divine Circulation Services was never 100 percent invested in
Keith Simmons Black Diamond, and it didn't lose all its funds
in Black Diamond.  Therefore, he instructed them to fill out
the probation forms that 12 percent of their balance was their
losses from the Divine Circulation Services scheme.

As laid out in the government's sentencing memo as
the Court will recall -- I can bring it up if it will be
helpful to the Court on the screen.

THE COURT:  I've got it in front of me.

MR. MEYERS:  The defendant admitted in December of
2009 that he had no other investments besides Black Diamond.
As his email to victims said, I believe when he was reporting
the fraud to his victims he said, "Over the course of the past
two years I have transferred all of our funds to Black
Diamond."

That, of course, was true in the sense that he was
invested anywhere.  Mex-Bank went bad, according to the
defendant's own admission, in 2008.  Audience Alliance went
bad in January of 2009.  And the European trading firm or the
mid term notes, Amkel, went bad by April.  This again is a
trial exhibit referenced in the government's sentencing memo,
admitted at trial by the defendant's own admission.

So it's just simply not true that Divine Circulation
Services was never 100 percent invested in Black Diamond.  It

1  was, at the time of the offense was discovered.

2       Now being most charitable to the defendant, he

3  withdrew a whole bunch of money from Black Diamond and he

4  invested it in Amkel, the European trading firm.  And he -- I

5  think it's undisputed.  It cannot be disputed that that money

6  came from Black Diamond.  He asked Keith Simmons for the

7  money.  Keith Simmons gave it to him.  And he sent it off to

8  Amkel.  Amkel was a fraud, as the defendant discovered very,

9  very quickly.  Luckily it was a fraud that was stopped by law

10 enforcement before the money could get transferred out.  But

11 that money is Black Diamond money.

12      And so, for the defendant to tell his victims, Don't

13 report your full losses on your form to the probation, I

14 believe is an obstruction of justice.  And it makes the

15 victims think, both, that they have lost less, and it

16 corresponds to his overall behavior towards the sentencing

17 hearing which is --

18      THE COURT:  How did it affect, if at all, the

19 numbers that probation ultimately reported from DCS clients?

20      MR. MEYERS:  It didn't affect it because probation

21 ignored it.

22      THE COURT:  So the numbers that are in the

23 presentence report from the government's view are real

24 numbers, not the 12 percent --

25      MR. MEYERS:  Yes, sir.

1          THE COURT:  -- discounted number.

2          MR. MEYERS:  Yes, sir.

3          THE COURT:  All right.

4          MS. McVAY:  Your Honor, may I be heard on this?

5          THE COURT:  Well, you may be heard when I --

6          MS. McVAY:  Okay.

7          THE COURT:  -- ask you to respond.

8          MR. MEYERS:  And Your Honor, the defendant has also

9    been telling his victims other false things in attempt to sway

10   their sympathies for the sentencing hearing.  He's told them,

11   for example, that the government is asking for a 50 year

12   sentence, which is simply not true.

13         THE COURT:  And how do you know this?

14         MR. MEYERS:  Because victims have told us this.  And

15   we received one of the emails that he's -- that came from his

16   mother about this.

17         THE COURT:  And so what you're saying to me is that

18   communications were made by the defendant to various victims

19   and potential witnesses that the government was going to argue

20   for something, when in truth and in fact the government never

21   had any intention of arguing for that.

22         MR. MEYERS:  Yes, sir.  And I think the Court can

23   see that from the letters submitted by the defendant.

24         THE COURT:  Numerous letters that refer to the

25   government's seeking a 50-year sentence.

1          MR. MEYERS:  Yes, sir.

2          THE COURT:  And your position is that that -- though

3    received by the Court in the form of letters from character

4    witnesses in support of witnesses, that idea originated with

5    the defendant?

6          MR. MEYERS:  I don't know where it originated, Your

7    Honor, but it didn't originate with the government.  I have

8    the email if it will be helpful for the Court.  I'll put it on

9    the ELMO, and I'll call it S2, Government's Exhibit.

10          So here is the email and it says, "Hi Mom.  Attached

11   is the format recommended for sending letters to the Judge for

12   sentencing."  Again, the intent is clearly to -- for letters

13   to this court.  "The government is recommending the maximum

14   sentence of 50 years."

15          It's just not true.  As the Court knows, we did

16   recommend that for Keith Simmons, but we recommended a

17   dramatically lower sentence for the defendant.

18          THE COURT:  And is it your representation to the

19   Court that you never communicated to the defendant or his

20   attorney that you would seek a 50 year --

21          MR. MEYERS:  Yes.  And I'm confident that the

22   defense counsel would confirm that.

23          THE COURT:  Madam Clerk, did you get a copy of that?

24          COURT CLERK:  Yes, sir.

25          MR. MEYERS:  I will note for the Court that the

1    Government's Exhibit S2 is filed as Document 223.  One of the

2    victims who is outraged, frankly, by this, I believe sent this

3    letter directly to the Court and the Court published it on

4    Pacer.

5            THE COURT:  All right.  Thank you.  Anything

6    further?

7            MR. MEYERS:  No, sir.

8            THE COURT:  Ms. McVay, I'll be glad to hear from you

9    on the obstruction enhancement.

10            MS. McVAY:  Yes, Your Honor.

11            With regard to the email from 2011.  Mr. Davey,

12   first of all, was not even indicted.  He thinks he's helping

13   his victims send in letters against Keith Simmons.  He's not

14   even trying to protect himself at that point.  He's trying to

15   look at the numbers.  Look at how much he has in different

16   places and say this is what I think you've lost.  He's not

17   indicted.  He's not -- he doesn't have a target letter.  He

18   has not done anything at that point to be trying to protect

19   himself, or to even think he's being looked at.  So when he

20   wrote the email, he in good faith wrote the letter.

21            When he sent the email in 2009 saying, I had

22   everything invested in Mex-Bank.  I believe you'll recall from

23   the testimony at trial he specifically told that that was a

24   mistake.  He was under a lot of stress.  And he just

25   immediately went to the worst case scenario and told his

1    victims what the worst case scenario was, that everything was

2    invested in --

3              THE COURT:  There were several things that he

4    testified at trial that he misspoke.

5              MS. McVAY:  Right.  And so, it's clear from all the

6    evidence and the fact that there's $3.6 million sitting in a

7    bank account that there was other money.  So his motive was

8    not to obstruct justice when he wasn't even being

9    investigated.

10              Now with regard to the email he sent to his mother,

11    I don't know -- I was not aware that his mother sent the email

12    out.  But from talking to his attorney and looking at the

13    presentence report, he's looking at 50 years.

14              THE COURT:  Right.  And so it's not the statutory

15    maximum that is contained in these letters, nor apparently in

16    the email that is referenced as to it's -- it's what the

17    government is seeking to put on him, which is different than

18    the maximum exposure under law.

19              MS. McVAY:  And, Your Honor, he's a lay person, so

20    he doesn't know the difference.  He just knows he's looking at

21    50 years.  He's not trying to paint the government in an evil

22    light or do anything evil.  He's saying, Mom, I'm looking at

23    50 years.  Can you get some people -- I can't talk to these

24    people, will you have them write letters on my behalf.

25              THE COURT:  Well, there does appear to be that kind

1  of paint in evil in the email when it makes the comparison

2  between man's intending something for evil and it does seem to

3  be exactly that.  If you want to put S2 back up.  Your point

4  that he's not trying to paint the government in an evil light,

5  or saying, "Mom, I'm looking at 50 years.  I can't talk to

6  these people."  It does appear that he's doing exactly that.

7  That he's painting the government in -- as an entity seeking

8  evil.  That seems to be a plain reading of that.

9            MS. McVAY:  And Your Honor --

10           THE COURT:  And I'm not saying that has anything to

11  do with any guideline objection.  But I'm just responding to

12  your point that he's not appearing to paint the government in

13  an evil light.  That seemed to be exactly what he's doing.

14           MS. McVAY:  Well, Your Honor, I respect your

15  opinion.  I just -- what my point is, though, I don't think

16  that he distinguishes between the presentence report and the

17  government.  He's just saying that, I'm looking at 50 years,

18  and that's probably how he should have said it.  Not knowing

19  that the way he said it meant something different.

20           But ultimately he is looking at 50 years.  And his

21  only purpose was to get a letter written on it -- have his

22  mother ask people to write a letter.  And I don't know why --

23  you know, I don't think he was attempting to obstruct justice

24  in what he was doing.  It should have just been saying, I'm

25  looking at 50 years, Mom, and can you get some people to write

1   some letters on my behalf.

2         THE COURT:  Thank you.  Giving the defendant the

3   benefit of the doubt with respect to the interpretation of S2,

4   the Court will not consider that in terms of the obstruction

5   enhancement.

6         Again, giving the defendant the benefit of the doubt

7   with respect to the timing of S1, it does appear to be from

8   calendar year 2011.  Although the information contained in

9   those letters appear to be false.

10        Having heard the trial evidence, and being aware of

11  Mr. Davey's intimate awareness of his investments, his role in

12  the offense of conviction, not only is it false, but the Court

13  would conclude that it is knowingly false.  It also appears to

14  the Court to be yet another example of Mr. Davey's sending out

15  solicitations, the effect of which is to penalize others for

16  his ultimate own benefit.

17        All of those conclusions of the Court appear to be a

18  fair reading of the exhibit.

19        Nonetheless, giving the defendant the benefit of the

20  doubt with respect to the timing of the letter, the Court will

21  grant the objection to the two-level increase for obstruction

22  of justice; not limiting the government in any way in using

23  that exhibit or any arguments that logically flow from it, in

24  terms of 3553(a) factors.

25        But with respect to the obstruction of justice

1　adjustment under the advisory guideline, I'll grant the

2　government's -- or I'll grant the defendant's objection to the

3　two-level increase.

4　　　　　With respect to the defendant's objection to loss

5　amount.  I've considered the recommendations of the defense

6　with respect to various adjustments to the ultimate loss

7　figure for monies that were arguably disbursed, monies that

8　have been seized; considered those objections and the

9　government's response.

10　　　　　I think that under the relevant conduct provisions

11　of the sentencing guidelines, that Mr. Davey is responsible

12　for his own conduct, and for the conduct of others that were

13　involved in jointly undertaken criminal activity is reasonably

14　foreseeable to him.

15　　　　　I think Mr. Davey was in a unique position to

16　understand the full nature of the fraud.  He was not only

17　someone who solicited money from investors, someone who had

18　made false statements with respect to the level of diligence

19　that he had undertaken prior to the solicitation; but as the

20　fraud evolved and developed, he became increasingly a pivotal

21　person in the criminal activity, including at one point being

22　the administrator of the pool of funds that came into the

23　organization.

24　　　　　So I believe that Mr. Davey was in a unique position

25　to understand the full nature and extent of the jointly

1    undertaken criminal activity, and as such he is exposed to the

2    sentencing liability that comes from his own conduct and from

3    the conduct of other hedge fund managers.

4         I think the testimony at one point was that there

5    were up to 11 different hedge funds that came within his

6    administrative responsibility.  And I believe, legally, he

7    would be responsible for the direct loss attributable to

8    victims he solicited, and also to the other victims that came

9    in through the other hedge fund managers in this jointly

10   untaken criminal activity.

11        The presentence report posits that figure at, I

12   think, approximately, somewhat north of $21 million,

13   $11 million of which came from Mr. Davey's own clients.  I

14   think that is a conservative estimate.  The government

15   believes that the total extent of the fraud is closer to

16   $40 million.

17        I think that the figures used in the presentence

18   report are a conservative estimate of the loss during the time

19   period where Mr. Davey was actively involved in the jointly

20   undertaken criminal activity.

21        Again, giving the benefit of the doubt to the

22   defendant, I think the government has made a strong case for a

23   22-level enhancement based upon a loss exceeding $20 million.

24        The Court is going to find that the subsection (k)

25   level for fraud in excess of $7 million, or in other words, a

1   20-level adjustment to the base offense level is a

2   conservative estimate of the fraud, and that is the adjustment

3   the Court will use for loss with respect to the advisory

4   guidelines.  Significantly discounting the amount that the

5   government has presented.  It's a conservative loss amount

6   finding by the Court, and it's the one that the Court will use

7   to determine the guidelines.

8          All other objections by the defendant with respect

9   to sophisticated means, investment advisor, have been

10  considered by the Court.  The Court finds that the response in

11  the presentence report is adequate, and the Court denies those

12  objections.

13         If for whatever reason the investment advisor

14  adjustment wasn't applicable, the Court would find

15  alternatively, that the defendant abused the position of trust

16  used a special skill warranting a two-level adjustment under

17  3B1.3.

18         Because the Court has found that the investment

19  advisor adjustment is applicable, the Court will not

20  additionally adjust for use of a special skill.

21         Similarly, the Court finds that there is

22  overwhelming evidence of the role in the offense adjustment.

23  The defendant was referred to by one victim as the biggest

24  crook of all in this conspiracy.  I do think that Mr. Simmons

25  played a greater role in this conspiracy, but I don't think

1    that anyone else was more cognizant of the nature and extent

2    of the fraud, and more active in its successful exploitation

3    of the victims.  And that would be the evidence concerning the

4    managerial supervisor adjustment the Court finds overwhelming,

5    as is the evidence of the number of victims and the reasonable

6    foreseeability to the defendant to the number.

7              All other objections of the defendant, whether I've

8    articulated them or not, are denied.

9              I'll be -- Ms. McVay, if there's any -- that's the

10   tentative finding of the Court.  If there are any additional

11   guideline calculations argument that you wish to make that

12   haven't already been considered by the Court, I'll be glad to

13   hear from you at this time.

14             MS. McVAY:  No, Your Honor.  There are no additional

15   guideline objections.

16             THE COURT:  All right.  The government care to be

17   heard on anything further?

18             MR. MEYERS:  No, Your Honor.  Thank you.

19             THE COURT:  So, having made the -- oh, and the other

20   thing is, I don't believe that there is a multiple count

21   adjustment for -- under the guidelines.  I believe when you

22   apply the multiple count adjustment rules, that they do not

23   increase the adjusted offense level.

24             So having made the findings that I have, it appears

25   to me that the adjusted offense level in paragraph 38 should

1    be a 42.  That there should be no multiple count adjustment.

2    So that the total offense level under paragraph 51 should be

3    42.  And a 42, criminal history category I, would lead to an

4    adjusted -- or an advisory guideline range of 30 years to

5    life.

6          Having made the findings that I have, those are the

7    advisory guideline calculations that I will utilize at

8    sentencing.

9          Ms. McVay, having made those findings, I'll be glad

10   to hear from you on behalf of Mr. Davey with respect to the

11   ultimate sentence to be imposed in any 3553(a) factors that

12   you think are applicable in this case.

13         MS. McVAY:  Your Honor, to be clear, do you want to

14   hear from the witnesses first?

15         THE COURT:  Well, it's your presentation.  Any way

16   you think would be most helpful to the Court I'll be glad to

17   hear from you.

18         MS. McVAY:  I would like to call the people to speak

19   on behalf of Mr. Davey.

20         THE COURT:  Very well.

21         MS. McVAY:  Call Mr. Edward Estes to come forward.

22         THE COURT:  Mr. McVay, as people speak on behalf of

23   Mr. Davey, you and they should know that I have read each of

24   the letters that have been submitted on his behalf and so

25   there would be no need to repeat what is contained in the

1   letter, except to the extent that there's other inferences to
2   be drawn from it.

3           Anybody that you do call, if they have submitted a
4   letter to me, if you would let me know that, so that I can
5   have the letter in front of me as I listen to the testimony in
6   court today.

7           MS. McVAY:  This is Edward Estes, IV, Your Honor.
8   He did submit a letter.

9           THE COURT:  Very well.

10          MR. ESTES:  My name is --

11          THE COURT:  Well, before you get -- I'm trying to
12  find your letter.

13          MR. ESTES:  Yes, sir.

14          THE COURT:  Estes.  E-s-t-e-s.

15          MR. ESTES:  That's correct.

16          THE COURT:  You're the Director of Admissions for
17  Virginia Beach Theological Seminary.

18          MR. ESTES:  Yes, sir.

19          THE COURT:  I'll be glad to hear from you.

20          MR. ESTES:  Thank you.  Yes, sir.  My name is Edward
21  Estes, and my wife's name is Meredith Davey, now Estes.  And
22  Jonathan is -- or Mr. Davey is her uncle.  And Meredith and I
23  invested $100,000 with Mr. Davey.  And it was important for us
24  to come down here to take off work to come at our own expense
25  to speak on Mr. Davey's behalf this morning.

1        Since I've been dating Meredith since 2007, I've had

2   the opportunity to be in many Davey family events.  And I've

3   had the opportunity to witness the close and loving

4   relationship that Mr. Davey has with his family.  And I know

5   him to be a caring uncle to Meredith, my wife, his niece.  I

6   know him to be a loyal brother to Daniel, his brother, who

7   also invested with him.  I know him to be a faithful husband

8   to his wife Shari, a dedicated matter to his daughter Abigail,

9   and devoted son to his father, Keith, who also invested with

10  him.

11       So I would just like to say that it's my belief that

12  Mr. Davey did not intentionally defraud me and Meredith, his

13  neice.  Nor, it's my belief also that he did not intentionally

14  defraud his brother Daniel, his father Keith, or the other

15  people who invested with him, some of whom are even childhood

16  friends.

17       And so even though I would be classified in this

18  courtroom as a victim, I do stand here this morning as an

19  advocate for Mr. Davey and ask Your Honor to show leniency to

20  him.

21       THE COURT:  Thank you, Mr. Estes.

22       MS. McVAY:  Your Honor, we'll next call Mr. Joseph

23  Lehner.  And he also has a letter before the Court.

24       THE COURT:  Mr. Lehner, I'll be glad to hear from

25  you.

1          MR. LEHNER:  Your Honor, I've known the Daveys since

2     1975 when I was transferred down to Norfolk.  And I've watched

3     Jonathan grow up with my sons.  And I've never seen anything

4     in his character that would show me that he would do the

5     things that he's been accused of.  I invested with him, and I

6     did it willingly.  It was not coerced or in any form forced

7     upon me.  And, yes, anytime you invest there is a chance of

8     loss.  I regret the loss, but still I consider Jonathan a very

9     sincere friend and an honest person.  And like I said, I have

10    known the family for many, many years.

11          THE COURT:  Thank you.

12          MR. LEHNER:  That's about it, Judge.

13          MS. McVAY:  Mr. Ed Siegel.  Your Honor, he does not

14    have a letter.

15          THE COURT:  Good morning.

16          MR. SIEGEL:  Hi.  I would like to read this because

17    I wrote it out yesterday.

18          My name is Ned Siegel.  My wife and I met Jonathan

19    and Shari Davey in the mid to late 1990s.  We attended the

20    same church and became friends.  At some point in time they

21    left that church and Jonathan helped start a new church, New

22    Hope Bible Church.  About a year later we also left and began

23    attending New Hope.  Sometimes Jonathan and Shari would come

24    over to our house for dinner, sometimes we would go to

25    their's.  Jonathan's desire to serve others and to serve our

1    Lord is in his blood.  He is currently very active in the

2    church they now attend.  In late 2008 I became my father's

3    legal guardian, and in May of 2009 I invested some of Dad's

4    money with Jonathan's investment company, Divine Circulation

5    Services.

6          As things turned out, we became a victim of Keith

7    Simmons and his Black Diamond Ponzi scheme.  I believe that

8    Jonathan also became one of Mr. Simmons' victims.  Let me tell

9    you why I believe that.

10         In 2001 Jonathan started a non-profit charitable

11   organization called Safe Harbor Christian Foundation.  I

12   served on the board of his foundation for nine years.  Its

13   purpose was twofold.  Safe Harbor accepted investments from

14   individuals and organizations, and would in turn send out

15   donor advised funds, where the donor would not only receive

16   annuity payments, but would also be able to direct where a

17   certain portion of their return on investment would go.  So

18   they could direct funds to go to their favorite charity.

19         Secondly, funds in excess of these payments could be

20   directed to charitable causes by the foundation.  We helped

21   support many missionaries, as well as other charities.

22         I remember one meeting where Jonathan was so excited

23   because he thought our returns from Black Diamond were so good

24   that he said something like "our investments are doing so well

25   that we're going to have a hard time giving it all away."  Let

1    me move ahead to late 2009 when the word came down about

2    Simmons' Ponzi scheme.  Jonathan was devastated.  I well

3    remember the meeting after that.  The focus was on ways we

4    could somehow try to get the foundation's investor's money

5    back.  How do you do that when it has all been stolen by

6    Simmons?

7            Then I remembered the conference call Jonathan made

8    to everyone who had invested money with him through Divine

9    Circulation Services.  It was a very difficult call for him.

10   Several times during the call Jonathan broke down.  He felt so

11   terrible that he had been taken by Simmons, and because of

12   that had lost much of his investor's money.  I recorded that

13   phone call and still have it on tape.  So, you see, this is

14   Jonathan Davey that I know.  I would trust him with my life.

15           Whenever visiting with Jonathan, his parting words

16   were always "Do right."  And I believe he has done his best to

17   do right.

18           Thank you, Your Honor.

19           THE COURT:  Thank you.

20           MS. McVAY:  Your Honor, the next one is Mr. Tom

21   Prinsen.

22           And just out of respect to the Court, I would like

23   to let you know that a lot of these people were considered

24   victims under the statute.

25           THE COURT:  Good morning.

1      MR. PRINSEN:  Hi.  My name is Tom Prinsen.  I echo

2  the sentiments being presented here.  The personal loss that

3  my wife and I experienced.  We invested approximately

4  $250,000.  It was our retirement and kids' college fund.  And

5  also received the word that it had been gone and have

6  experienced nothing but the shame and regret that Jonathan

7  experiences as a result of our loss and all his victims.

8      I have not written a letter to you for this purpose

9  but -- there -- can I get some water?

10     THE COURT:  Sure.  There's some water on that table.

11     MR. PRINSEN:  In late 2009 a co-worker of mine was

12  preparing to retire.  He'd been a senior level systems

13  manager, and a highly compensated employee.  And he said, Hey,

14  you know -- I was telling him how good our investments were

15  doing.  He said, You know, I got to consolidate my funds.  I

16  think I want to do that.  And I said why I would recommend

17  Jonathan Davey.

18     He contacted Jonathan, and it was moments or days

19  after Mr. Simmons had been arrested.  Jonathan's response to

20  him was, I cannot take your investments at this point.

21     I believe that demonstrated integrity.  He was

22  looking at -- if I can guess without knowing the amount of

23  money -- three quarters of a million dollars.  It might have

24  been triple that for all I know.  But he turned down the

25  amount of money.

1    We were scheduled to testify in the trial regarding
2  these events.  At some point our testimony was canceled or we
3  were told we are not needed down here so that did not become
4  part of it.

5    But I believe it lends to the character and
6  integrity with regards to Mr. Davey.  And so in light of those
7  bits of information, I'm requesting leniency for Mr. Davey.

8    THE COURT:  Thank you.

9    MS. McVAY:  Your Honor, we would call Ms. Linda
10 Brobeck.

11    Your Honor, she does have a letter on file.

12    THE COURT:  What's your last name?

13    MS. BROBECK:  Brobeck.

14    THE COURT:  How do you spell that?

15    MS. BROBECK:  B-r-o-b-e-c-k.

16    THE COURT:  Thank you.

17    MS. BROBECK:  Thank you for allowing me to speak.

18    I am an educator and a former principal/teacher.  I
19 currently work at Otterbein University.  I am not a victim of
20 this.  I have only known Jonathan -- my husband and I have
21 known him for five years.  We know the Jonathan that is kind
22 and honest.  He's a Godly man with strong integrity.  And I
23 echo what the other people here have said.  And we believe
24 that he was unknowingly drawn into this scheme.

25    I would ask that, you know, society is not going to

1    benefit by him being in prison.  And I would ask that there be

2    some other way -- some other way that would be more beneficial

3    outside of prison.  And as a taxpayer, I think it's a waste to

4    put him in prison, guilty or not, whatever, you know, has been

5    decided here.  So I would ask that there's some other

6    alternative.

7         You know, there's other very many heinous crimes

8    where people are, you know, murdering children and they're out

9    in five to eight years.  And what I'm hearing is, this is a

10   much longer time.

11        I'd ask you to consider what the end result you

12   would desire when this is all said and done.  What is the end

13   that you want for Jonathan?  Is it rehabilitation?  Or is it

14   just punitive punishment?

15        I ask you to please extend logical and beneficial

16   lenient understanding in your sentencing.  Thank you.

17             THE COURT:  Thank you.

18             MS. McVAY:  Your Honor, then we would call Dr. Eric

19   Lehner.  He also has a letter on file.

20             MR. LEHNER:  Thank you, Your Honor.  It's a

21   privilege to say to the Court that I consider Jonathan Davey

22   to be my friend.  We've known each other for nearly 40 years.

23   I was in his wedding.  He was a groomsman in my wedding.  I've

24   known Jonathan all these years to be a kind and authentic man,

25   and a man of integrity, and I'm glad to say that before the

1    court today.

2          I do not believe that Jonathan knowingly defrauded

3    me of my entire investment.  My father, his father, his family

4    members, and other friends believe that it was his sincere

5    desire to be helpful to them.

6          And so I think I would like to ask the Court to

7    consider a lenient sentence, and the prospect that he might

8    have an opportunity to provide restitution to those who

9    suffered loss.

10          THE COURT:  How would he do that?

11          MR. LEHNER:  I believe by working freely with his

12   skills, under a supervision that is satisfying to the Court.

13   He could do the very best of his ability to do what is already

14   in his heart, and that is to provide restitution to those that

15   have suffered loss.

16          THE COURT:  Thank you.

17          MS. McVAY:  Your Honor, before I address the other

18   3553 factors, I would like to have Mr. Davey speak on his

19   behalf.

20          THE COURT:  Mr. Davey, you're welcome to speak now

21   or at a later point.  I want to advise you, just on the

22   record, that you don't have to say anything at all.  But it's

23   your right to speak.  So if there is something you wish to

24   tell me, I'd be glad to hear from you.  Just want to make --

25   just want you to make sure that you know there's no

1    requirement to do that.  It's a choice that you make if you
2    want to.

3            THE DEFENDANT:  Right.  I'll speak at the
4    appropriate time if it's right before sentencing, whatever, I
5    do want to speak, Your Honor.

6            THE COURT:  I'll be glad to hear from you.

7            MS. McVAY:  Your Honor, just to be clear though,
8    I -- you're going to make a determination of the 3553 factors,
9    and as you hear from Mr. Davey you'll include that in your
10   calculation.

11           THE COURT:  Certainly.

12           THE DEFENDANT:  Your Honor, these past five years
13   have been not only painful but saddening as I've watched the
14   financial turmoil that has happened to my clients, and it is
15   all because I believed the lie of Black Diamond.  I have to
16   bear the shame of that for the rest of my life because I got
17   snookered.  But every action I took was based on the belief
18   that Black Diamond held the funds that were due to my
19   victims -- my clients.  And I would never intentionally harm
20   anyone, and tell them that something was good if I knew it was
21   bad.  I'm not going to harm Dr. Lehner.  We grew up -- we're
22   pals.  He was in my wedding.  I was in his wedding.  I'm not
23   going to harm him.  Tom Prinsen spoke.  We worked together for
24   the past 20 years.  Our kids grew up together.  I'm not going
25   to harm him.  I'm not going to harm my wife, my wife's

1    parents, my parents, my family.  It's unconscionable that I

2    would try to intentionally harm everyone who is close to me.

3            I believed Black Diamond.  And, yes, as the

4    administrator I saw funds going in.  But I also thought those

5    funds were taken care of.  I had no idea that Mr. Simmons was

6    out there spending it all.

7            And I did not know what the government knew.  If I

8    would have known what the government knew when the government

9    knew it, I would have acted upon it.  Like I acted upon others

10   when I found out there was fraud.  I didn't know.  But when I

11   did know, I immediately told my clients about it.  I

12   immediately started filing amended tax returns on their

13   behalf.  I immediately stopped working with any of these other

14   guys who would not also tell their clients.  And unbeknownst

15   to me, they went and started new hedge funds and continued to

16   perpetuate the fraud.  That's unconscionable to me.  I was

17   shocked to learn that in discovery when I saw the government's

18   documents on them.  I was speechless.

19           But the most important thing to me, even more than

20   the sentence that you're going to impose on me today, is the

21   ability for me to clear my name.  And fortunately there are

22   some appellate attorneys who have offered, and stepped forth

23   to help me, completely free of charge, to work toward proving

24   my innocence.  And my only request to you is allow me to work

25   with them so they can help me prove my innocence and clear my

1   name.   Thank you.

2           THE COURT:   Thank you.

3           MS. McVAY:   Your Honor, with regard to the 3553

4   factors, I thought about this case a long time.   I think

5   you're in a very tough position as a judge, because you have

6   to try to find and balance the needs for punishment, the

7   situation with the other people who don't see the facts the

8   way Mr. Davey's friends and family see it.

9           I know you'll hear from other people who have

10  concerns, that have financial devastation, who are

11  disappointed, that may not even know Mr. Davey, that have no

12  relationship with him, and have invested through other people

13  or other circumstances.   So I do -- I know you hear the cries

14  from the people from both sides.

15          I do think this case is a very unusual case.   I've

16  been practicing for 25 years, and traditionally in fraud cases

17  you will find the person -- the -- a lot of individuals who

18  intentionally defraud people, and they calculate their plan on

19  how they're going to get money out of individuals.

20          In Mr. Davey's case I asked the question, what if he

21  had went to the FBI?   What if any of them, or all of them had

22  went to the FBI when they drove from their homes in California

23  or from Ohio and showed up at Keith Simmons' door and he was

24  not giving them their money and they all went and turned him

25  in together.   Would we even be here?   Would we be prosecuting

these people?

I believe the ultimate factor in this case is, they just sat there and they did nothing.  They just waited. Hoping that Mr. Davey would pay -- that Mr. Simmons would pay them.  That Mr. Simmons would release the funds.  That this was real, and that it would continue to go on.

And I think what you'll -- based on some of the things that the government put in their presentence report, statements that Mr. Davey made about, he created the algorithms, or he saw the platforms.  Those comments are consistent with somebody who is making millions of dollars in their mind, thinking they're successful, thinking the money is great.  And making statements because they want to get credit for the success of what they believe is successful and what's really going on in their mind, not knowing that the whole thing is a fraud.

I truly -- Mr. Davey, I would think, would never have made those statements.  But those statements were based on somebody who thought he had these great investments and he wanted to get the credit for them.

As a result of some of the things that happened, Your Honor, there are lots of victims and lots of people that are hurt in this process.

But I would like to point out to one of the things that Ms. Yvonne Davey, his mother said.  She said that from

1  the time Jonathan -- he's her youngest child -- he was always

2  obedient.  He was always honest and truthful, even as a small

3  kid.

4          Mr. Davey chose to go to trial because he believed

5  in the criminal justice system, believing that he would be

6  found not guilty in this process.  To the point that even

7  Mr. Keith Simmons came in this courtroom and testified that

8  they didn't know.  He testified to that.  That, you know, it's

9  not like they --

10         THE COURT:  Do you think I should believe Mr. Keith

11 Simmons?  Do you think he's a credible witness?

12         MS. McVAY:  Your Honor, in this case I do.  I do

13 think that they didn't sit down and have a meeting and say,

14 let's steal some money from these people.  I think that they

15 thought he was a great personality.  He convinced them that

16 this is, you know, a great investment, and they followed

17 through because of his personality and his efforts.  And so I

18 just say that to Your Honor that --

19         THE COURT:  Keith Simmons indicated that he had no

20 intent to defraud them.  Referred to his victims as "supposed

21 victims."  He said, "I never had the intent to defraud.  Did

22 not conspire with anyone."

23         And you believe that I should conclude that he was a

24 credible witness and rely upon his testimony in reaching a

25 sentencing decision with respect to Mr. Davey?

1          MS. McVAY:  Yes, Your Honor, I do.  I truly believe

2    that.  I believe that after he --

3          THE COURT:  He's not saying that Mr. Davey didn't

4    have any intent to defraud.  Keith Simmons came in here and

5    testified under oath that he himself had no intent to

6    defraud --

7          MS. McVAY:  Right.

8          THE COURT:  -- when he raised over $40 million in

9    investor money, promising to invest it in a foreign exchange

10   and didn't invest but a fraction of it.

11         MS. McVAY:  And he also testified that none of the

12   hedge funds participants knew that he was not investing the

13   money.

14         THE COURT:  Right.  But in order to believe that,

15   don't I have to believe Mr. Simmons when he talks about his

16   own culpability?

17         MS. McVAY:  Well, he admits he didn't spend the

18   money and he didn't invest it.  He didn't lie about that, Your

19   Honor.  He admitted he spent it all and he didn't invest it.

20         THE COURT:  Right.  But nice for his investors to

21   have known that.

22         MS. McVAY:  Yes, Your Honor.  And so I just say that

23   to you to say that if they had turned him in, and if they had

24   done some things different, I wonder if we would be here, but

25   they didn't.  So they're before the court -- they're before

1  you because there's a ton of money and lots of victims

2  involved.  And I know you have to balance what's important for

3  all the parties involved.

4       With regard to Mr. Davey, he's never been in

5  criminal trouble.  Never had any issues.  He was a certified

6  public accountant.  He was working.  I attached some exhibits

7  to show that, you know, he did do some things right, including

8  he -- CFTC contacted him.  He gave him all his companies.  He

9  notified them of that.  Some of the other things he did right

10  is, he notified this court of $3.6 million when he had a

11  passport, when he was -- he could have took that money and

12  left the country and a lot of people would have.  But he chose

13  not to do that.  He notified the court, and that money is

14  sitting in a bank account.  Of course he would like those

15  funds to be distributed to his shareholders.  And of course

16  the government wants it to be distributed to all the

17  individuals in this case that are all crying out to the court

18  saying, Help us, Judge.  We need money.  So that is something

19  right.

20       The other thing he did right is, like Tom Prinsen

21  testified to, is that he didn't take any more investments.

22  Once Keith Simmons was arrested, he didn't take any more

23  investments.  He didn't --

24            THE COURT:  How about in August of 2009?

25            MS. McVAY:  Right.  In August 2009 he did take that

investment from that church, $200,000, and those people were
hurt.  At that point, I don't know what stage he was in.  Was
he in the denial stage?  Because there's stages of grief.
There's stages of which called denial.  Was he in the denial
stage?  Okay.  This will come through.  Keith Simmons is not a
fraud.  Let's hope this works out.

At some point he got past that denial stage and he
made a conscious decision not to take any money in.  He made a
conscious decision to get $3.6 million back in the hands of
the Court.  And he made a conscious decision not to take any
additional money.  So we're asking the Court to take those
factors into consideration in the sentencing process.

Additionally, I would just like to share with you,
one of the friends of his wrote a letter and he was talking
about how he and his wife were at home in bed and --

THE COURT:  That was an extraordinary letter.

MS. McVAY:  Yes.  He woke up to a guy standing over
him with a knife.

THE COURT:  Stabbed 25 times.

MS. McVAY:  Stabbed 25 times.

And it turned out to be his daughter's boyfriend.
And he thought that in that situation he asked the Court to
give him eight years of -- the daughter's boyfriend and the
daughter so they would have the light of day.

And I know that the government and the law has

1   created a situation where they believe that people involved in

2   fraud, financial fraud, should spend extensive amounts of time

3   incarcerated.  And so --

4           THE COURT:  Even -- I mean, it was an extraordinary

5   letter, and an extraordinary act of forgiveness by a victim of

6   a violent crime.

7           But if the Court were to conclude that this criminal

8   conduct which lasted over an extended period of time, for

9   years, involved multiple misrepresentations and deceptions and

10  injured far more than one person, aren't those characteristics

11  of this criminal activity that is not present in the bizarre

12  and admittedly dangerous crime that was spoken of?

13          MS. McVAY:  Yes, Your Honor, because of the years.

14          But I think what you'll find is, in that process you

15  have somebody who is believing in the lie.  And so they're

16  making transactions, making transactions, bringing money in,

17  giving money, taking money out.  And as Mr. Davey said, he was

18  in a unique position to actually see money coming out.

19          THE COURT:  What about the house?

20          MS. McVAY:  I'm sorry.  What?

21          THE COURT:  What about the house?

22          MS. McVAY:  A house, Your Honor.  A $3.8 million

23  house.

24          THE COURT:  I'm talking about the source of the

25  funds.

1          MS. McVAY:  You're talking about from Mr. Claggett?

2          THE COURT:  No, I'm talking --

3          MS. McVAY:  You're talking about the way it went

4    overseas and came back?

5          THE COURT:  No.  I'm talking about the investor

6    funds that went into the house and later characterized as a

7    loan default, and served as a basis for the tax fraud

8    conviction.  What possible explanation is there for that?

9          MS. McVAY:  Your Honor, the explanation, I think, Mr

10   --

11         THE COURT:  Other than greed or evil.  What --

12         MS. McVAY:  Well -- well, let me -- greed or evil,

13   Your Honor, let's put it this way:

14         If Keith Simmons was real and everybody walked out

15   of here with in excess of $48 million, it would have been like

16   something that takes place that would never have been an

17   issue.  But Keith Simmons wasn't real.  So everything he did,

18   you know, it's almost like, Oh, I can do this because all

19   these numbers are real and I'm going to be rich.  If all

20   that's true, $3.8 million is not a whole lot of money, if the

21   people who were investing really got the returns they were

22   supposed to get --

23         THE COURT:  What right did Mr. Davey have to take

24   investor's money and put it into his house and then declare a

25   loan default?  What right did he have?

1          MS. McVAY:  Well, Your Honor, based on his belief,

2     those numbers were real numbers.  So those were his profits.

3     We brought in Sherry Jarrell, the hedge fund lady who

4     testified that the hedge funds are pooling of funds that

5     people are allowed to take out money for their business, for

6     profit, for their education, for their own family, for their

7     own -- so he thought those were his proceeds of the profits.

8     He thought that those were his percentages of what he was

9     entitled to.

10          And when he didn't continue -- what he did do right,

11    again, he came to Claggett and said, Look, I can't build this

12    house.  I'm going to give this back to you.  He didn't keep

13    trying to build the house and build the house.  He recognized

14    that there was an issue, there was a problem.  And he didn't

15    keep moving forward in the direction of fraud.  He moved in

16    the direction of, I'm going to give this house back to you.

17    I'm going to give this property back to you, and I'm going to

18    go back and live in my own little house that I've been living

19    in.

20          This is a very unfortunate situation.  But I do

21    believe that Mr. Davey, in the process, believed in Mr. Keith

22    Simmons; right or wrong, deception/non-deception,

23    arrogance/non-arrogance, whatever it was.  In his heart of

24    hearts he believed that.  He believed the lie.  And he ran

25    down the rabbit trail with the lie to the point that we're

1    here today.

2            He wanted to go to trial.  He had numerous

3    opportunities to do something different, but in his mind he

4    truly believes in his heart of hearts that he never intended

5    to defraud his friends and his family.  If you look at those

6    letters you received, some of those people have known him for

7    40 years, 35 years.

8            THE COURT:  The letters in support are beautiful

9    letters.

10           MS. McVAY:  Twenty-five years.

11           THE COURT:  They point out to the Court a side of

12   Mr. Davey that is admirable.  The letter from a wife, from

13   brothers, family and friends, very helpful to the Court to see

14   a side of Mr. Davey that the Court should see in fashioning a

15   sentence.  And to hear the testimony today by family and

16   friends still supportive, and still speak on his behalf, is a

17   credit to Mr. Davey.  And all of that testimony, the letters

18   in support, I've read each and every one of them and will take

19   them into consideration as I determine a sentence.

20           MS. McVAY:  Your Honor, the only thing I also like

21   to say is, the government's sentencing memorandum points to a

22   Monique Martens, and how she talked about how she couldn't

23   speak and things of that nature.  They took documents from

24   people, I guess from when they sent in their paperwork from

25   Keith Simmons, and then attributed them to Mr. Davey without

1   even talking to them.

2          Because Monique Martens, I was on the phone with her

3   at 1:00 this morning.  She lives in California.  She was going

4   to come to testify, and then we made a decision for her to

5   bring a letter at the last minute.  Mr. Davey was one who

6   successfully got her million dollars out of Amkel for her that

7   she's sitting -- she invested one day and got the money back

8   out, like, two or three days later, successfully, on her

9   behalf.  She talked about the tireless hours that he worked on

10  trying to get that money back.

11         THE COURT:  I read that letter.

12         MS. McVAY:  The money that Mr. Davey actually told

13  the government about.  They knew about this money and they

14  just said, Oh that money's never coming back.  Oh, forgot it.

15  The government didn't try to help get the money back.  He,

16  effortlessly, went to Switzerland, went to Europe, did

17  everything he could to get that money back and was

18  successfully able to do it.  So we're just asking you to take

19  those factors into consideration.

20         Mr. Davey has asked me to ask you for probation

21  today.  I understand that you have to balance the issues with

22  other people.  But we also ask you to consider the sentencing.

23  The government has showed the other sentences that people have

24  received in this district, as well as the fact that

25  Mr. Simmons is getting -- Keith Simmons got 40 years, 240

1  months.  I looked that up.  I pulled up everybody's

2  sentencing.  I --

3          THE COURT:  He got 50 years at first and then the

4  Fourth Circuit told me that was too much.  So the money

5  laundering conviction was set aside.  Mr. Davey stands

6  convicted both of the money laundering and also the tax fraud,

7  which puts him in, for that purpose, in a different place than

8  Mr. Simmons.

9          MS. McVAY:  But, Your Honor, we're asking you to

10  consider the fact that, yes, Mr. Simmons is more culpable than

11  Mr. Davey.  So we're asking under the 3553 factors to reduce

12  Mr. Davey's sentencing, we're asking for a variance.

13          We're also asking you to consider, Mr. Davey is 50

14  years old.  He is not the type of person to go out and just go

15  and commit another fraud.  It's almost like he just stumbled

16  into a fraud.  There's nothing in his history to show that he

17  would do this again, or that he has ever done anything like

18  this, ever, in his life.  And that --

19          THE COURT:  How does Government's Sentencing

20  Exhibit 1 impact that argument?

21          MS. McVAY:  I'm sorry.  Can you --

22          THE COURT:  Government's Sentencing Exhibit 1, the

23  letter to clients saying, Write down 12 percent --

24          MS. McVAY:  Your Honor --

25          THE COURT:  -- number.

1      MS. McVAY:  -- that goes back to, he was not even

2  indicted.

3      THE COURT:  Right.

4      MS. McVAY:  He literally thought -- I mean, so he's

5  not trying to protect himself.  He's going after Keith

6  Simmons, thinking he's going to be a witness against Keith

7  Simmons at the time he gives these numbers.  He thinks he's

8  helping them and he's going to be sitting at the witness stand

9  and those are the numbers.

10      THE COURT:  How is he helping them telling them to

11  write down a lesser percentage than they actually lost?  How

12  is he actually helping them do that?

13      MS. McVAY:  From his perspective, those numbers --

14  well, based on what the investment, Amkel, and at the time he

15  thought he had a reasonable return on those funds.  And he

16  thought those funds would go directly to his clients.

17      If you take those dollars and deduct them, and then

18  we have the movie producer who is flying in from London.  He

19  actually flew in and showed up to testify.  But that testimony

20  was precluded.  He was going to come testify about giving the

21  return on the movie money.  Peter Branson.  So --

22      THE COURT:  How does providing false monthly

23  statements showing a profit, which investors did not earn,

24  which has tax consequences for the investors, how does that

25  help them?

1          MS. McVAY:  Your Honor, those are numbers that

2     Mr. Simmons gave him.  Mr. Davey reported the numbers.  And

3     the strangest thing about it is, all the numbers were

4     completely accurate.  Nobody is saying he changed the numbers

5     and switched it around and gave himself more money.  He took

6     whatever numbers Keith Simmons gave him, and actually reported

7     them accurately.  And the government used those numbers.  They

8     took everything that Mr. Davey calculated and used it at

9     trial.

10          Now he intended to commit a fraud, why would he

11     create accurate numbers -- I mean, not that they were

12     true because Keith Simmons --

13          THE COURT:  He's getting 50 percent.

14          MS. McVAY:  Keith Simmons made them up.

15          THE COURT:  He's getting 50 percent on the numbers.

16     He's getting an administrative fee.  He's getting a salary.

17     All of that works to his benefit to the detriment of everybody

18     that dealt with him.

19          MS. McVAY:  Well, Your Honor, but it's still based

20     on the fact that he believed the numbers.  Because if he

21     didn't believe the numbers, I mean, if you're really trying to

22     commit a fraud, why wouldn't you just take $3.5 million, go to

23     Europe with your passport and leave the country?

24          THE COURT:  If you believe the numbers, why would

25     you call it investor funds, pour it into a house as a loan

1    later to be defaulted on?  Why would you tell somebody else

2    those were charitable donations, if you believe those numbers?

3    Is there any explanation for that?

4            MS. McVAY:  Well, Your Honor, I -- I have no

5    explanation as to the credibility of the statement or the

6    testimony, I don't.

7            THE COURT:  Yeah.

8            MS. McVAY:  But again, Your Honor, I'm asking you to

9    consider all these factors.  Consider the things that

10   Mr. Davey did right in this case.  His efforts to try to make

11   his victims whole by spending the time and energy to try to

12   get the funds back.

13           And we're asking that you take into consideration

14   all the sentences of the people associated with this case.

15   And truly take into consideration, Your Honor, the fact that I

16   do not believe that -- unfortunately like you said -- that

17   based on the case and the facts in this case, even the

18   government is asking that he receive a sentence lower than

19   Mr. Simmons.

20           THE COURT:  In order for me -- I understand your

21   disparate sentencing argument, and that is a factor for the

22   Court to consider.  But you're also making an argument that

23   Mr. Davey is not a future danger to society.  And I heard

24   from, I think Mr. Prinsen, that one of the benefits of a

25   lenient sentence would be that Mr. Davey would be in a

position to make restitution.  And so one of the concerns that
the Court has, is this need to protect the public from further
crimes of the defendant.

If the Court concludes that the jury had it right,
that Mr. Davey intentionally, knowingly, defrauded these
victims of million dollars of funds and appears before the
Court today proclaiming innocence, testified at trial under
oath, that many of the false statements he made to different
people were situations in which he misspoke or his head was in
a blunder so he really wasn't thinking clearly.  If he's of
that mind frame that he was totally innocent, totally duped by
Mr. Simmons.  If the Court were to impose a lenient
sentence -- even though the Court believes that the jury had
it right, that Mr. Davey's intentionally committed multiple
acts of fraud over a long period of time and then ratcheted up
the fraud from stealing people's money, to lying about the
nature of the investment in the home and cheating on his
taxes.

If the Court believes that those are all a more
accurate understanding of the facts, then wouldn't the Court
be failing in its duty to protect the public from future acts
of this kind from someone who has no comprehension of those
realities?  Isn't that what you're asking me to do, if I
believe that the jury had it right in terms of the evidence
presented?

1    This is not someone who is appearing in front of the

2    Court and saying, I made a big mistake and I really learned

3    from that lesson. This is someone who says to the Court

4    today, I am totally innocent. And I had no fraudulent intent.

5    There is no difference in attitude and demeanor today between

6    Mr. Davey and Mr. Simmons. They are two peas in a pod with

7    respect to how they view their conduct in this fraud scheme.

8    And so what is the Court to do with that with

9    respect to the purposes of sentencing?

10    MS. McVAY: Well, Your Honor, with regard to

11    purposes of sentencing, I think -- first of all, we don't know

12    why the jury reached the verdict they did. And I think it

13    could reasonably be that the jury found that he failed to do

14    his due diligence, and failed to investigate Mr. Keith

15    Simmons. And failed to do the things that were necessary to

16    make sure that it was a good investment.

17    With regard to Mr. Davey's attitude, I believe that

18    Mr. Davey is one of those people that functions in black and

19    white, and right or wrong. And in this case he believes that

20    Mr. Simmons duped him.

21    And when you talk about recidivistness [sic] or

22    propensity to do additional harm, I truly believe that you

23    would never see Mr. Davey in this courtroom concerning any of

24    these issues. I think he found himself in a situation that is

25    unique, that he would never be in again. I think his wisdom

1    has taught him not to be involved in people -- relying on

2    people like Bryan Coats and individuals who talk well but

3    have, you know, little substance in which they're displaying.

4              Additionally, Your Honor, I would like to point out,

5    though, that Mr. Davey also returned $400,000 to his victims

6    prior to the government seizing the Huntington bank account,

7    which brought their attention to that account.

8              Thank you.

9              THE COURT:  Thank you.  Mr. Meyers.

10             MR. MEYERS:  Your Honor, I too was struck by the

11   letters that people wrote on the defendant's behalf.  He is

12   clearly a person who has shown kindness to others.  Who is

13   good to his family.  Has shown kindness and even generosity to

14   them.

15             And I was struck, also, by what people said in court

16   today.  One of the things -- and I think that is, like the

17   Court said, deserving of sentencing consideration.  And it is

18   one of the reasons that the government is recommending a

19   sentence that is half of the sentence Keith Simmons received.

20   I think there is a difference there.

21             I was also struck by the dualism of Mr. Davey, and

22   it's the only way that I think I can put it.  Mr. Siegel, who

23   was a victim in this case, referred to "The Jonathan Davey I

24   know."  It's a quote from what he said today.  It is obvious

25   that "The Jonathan Davey I know" from the perspective of his

1    victims and his friends and his families is not the whole

2    Jonathan Davey.  I won't say it's not the real Jonathan Davey,

3    because I don't know what the basis is for his acts of

4    kindness.  I want to give him the benefit of the doubt on

5    that.  What I do know is that it is not the whole Jonathan

6    Davey.

7         So when Ned Siegel says, "The Jonathan Davey that I

8    know," it's not the whole Jonathan Davey.  Because there is a

9    side to Mr. Davey that Mr. Siegel does not know, and still

10   does not know to this day, but that the Court knows and that

11   we know because of the evidence.

12        What I am showing the Court now is Government's

13   Trial Exhibit 141a page 11.  This is Mr. Davey's own Quick

14   Books, his own entries.  And it is the portion of Mr. Davey's

15   Quick Books that refers to the investment from Mr. Siegel who

16   spoke today about the Jonathan Davey he knows.

17        What these Quick Books show, is that prior to

18   Mr. Siegel's investment on May 14, 2009, there was a $124,000

19   in Mr. Davey's DCS account.  I will remind the Court, and we

20   induced other exhibits at trial, that by May of 2009 there

21   were hundreds of thousands of dollars of unfulfilled

22   withdrawal requests.  There was numerous communications about

23   the problems of Black Diamond.  Mr. Davey did not send a dime

24   to Black Diamond after February of 2009, and was not getting

25   any money out.  Hundreds of thousands of dollars of

1   unfulfilled withdrawal requests.

2           Mr. Siegel's a new customer in May of 2009.

3   Mr. Siegel invests $224,000 -- excuse me, he invested over

4   $100,000, which brings the balance up to $224,000.

5           What Mr. Davey's own Quick Books show, is what

6   happened to that money in May of 2009, and they show a few

7   things.

8           First, not a dime of it went anywhere for

9   investment.  Nothing to Black Diamond.  The very same day the

10  money comes in, Mr. Davey transfers over $167,000 to Sovereign

11  Grace.  Sovereign Grace, as the Court knows, was the company

12  supposedly in Belize that Mr. Davey used to launder victim

13  money to his mansion he was building.  That was the only

14  purpose of it.  Mr. Davey admitted that at trial.  The only

15  purpose of Sovereign Grace was to pay for construction of

16  Mr. Davey's mansion.

17          So after $167,000 goes out, there is now only

18  $56,000 left in the account from DCS.  He sends another,

19  little over $1,000, making it $55,000.  And then, again, all

20  within approximately 10 days of Mr. Siegel's money coming in,

21  comes out an additional $35,000 in management fees for

22  Mr. Davey, bringing the account balance down to $20,000.

23          In 10 days Mr. Davey takes out 200 grand all for

24  himself.

25          THE COURT:  Are you saying that none of Mr. Siegel's

1  investment was invested in Black Diamond at all?

2  MR. MEYERS: Yes, sir. In fact, nobody's investment

3  --

4  THE COURT: Regardless of whether Black Diamond was

5  a fraud, regardless of whether Mr. Davey's knew that it was a

6  fraud. There's no way that Mr. Siegel's investment ever went

7  into Black Diamond.

8  MR. MEYERS: No money that came in from anybody

9  after February went to Black Diamond. He just didn't send it.

10  He put it in his cash account.

11  THE COURT: So three months later he's getting a six

12  figure investment from Mr. Siegel that went into his house and

13  his pocket.

14  MR. MEYERS: Yes, sir.

15  And it's undisputed. This is Mr. Davey's own Quick

16  Books. You will see the two entries for Sovereign Grace.

17  Mr. Davey made them himself in his Quick Book account.

18  I want to address an argument that I heard from

19  defense counsel. The Court asked, you know, how could he do

20  this? How could he take this money after Black Diamond has

21  gone bad?

22  And the answer was, Well Mr. Davey thought it was

23  his profits. And he was just taking his profits out, and he

24  believed in Black Diamond. His own Quick Books entries show

25  that that is not true. Mr. Davey wrote in his Quick Books,

1   "Sovereign Grace, Incorporated investment."  I-N-V-E-S-T

2   period.  It wasn't his profits.  He wasn't withdrawing

3   profits.  He was lying and making his records conform to the

4   lie he had set up from the beginning, that this was an

5   investment in Sovereign Grace.

6          I will also note that in the memo line that it says

7   "Loan to Sovereign Grace."  So this isn't an after the fact

8   kind of thing, this was set up from the beginning.

9          And so I want to go into the nature and

10  characteristics of the offense.  I think the Court understands

11  my argument about the nature and characteristics of the

12  defendant.

13         With regard to the offense, contrasting Mr. Davey

14  with Mr. Simmons, defense counsel made the argument -- I

15  understand the argument -- that it wasn't like he calculated

16  how he was going to get people's money, but he did, from the

17  very beginning.

18         He committed perjury under oath in 2008 about

19  Sovereign Grace.  He said it was an investment platform and

20  never was, not once.  It was set up to funnel money to his

21  mansion.  And that was true from the beginning.  Not a dime

22  ever went anywhere from Sovereign Grace.  He did send some

23  money to Black Diamond in the beginning, but not a dime from

24  Sovereign Grace went anywhere.  So Mr. Davey set it up from

25  the beginning as a fake loan.

1          And the Court will recall the testimony from the
2    trial that when Mr. Davey was asked about Sovereign Grace he
3    said a few different things.

4          Under oath on the record he said, "It's an
5    investment platform." That was a lie. Just a flat out lie.
6    There's no way to say it wasn't, under oath.

7          He said later to a victim, that the money supposedly
8    for the loan to Sovereign Grace was a charitable donation for
9    missions. That's highly significant to Mr. Davey's victims
10   who invested with him because of his professions of faith. He
11   said it was a donation for missions. Mr. Davey says now it
12   didn't happen. But there are contemporaneous notes introduced
13   at trial. That victim took notes, contemporaneous, and wrote
14   it down.

15         THE COURT: Mr. Woetzel.

16         MR. MEYERS: Yes, sir. Those are an exhibit.

17         So Mr. Davey would have to say that victim's notes
18   were falsified at the time and that he somehow came up with it
19   was --

20         THE COURT: I think Mr. Davey's testimony at trial
21   was that he misspoke when he referred to it as a charitable
22   donation.

23         MR. MEYERS: That's what he said at trial. Now he
24   said it didn't happen.

25         Your Honor, the defendant told his employee, Erin

1  McFerren, that the reason he was incorporating in Belize was

2  because it's harder to audit overseas companies.  The

3  defendant also said that he planned to default from the

4  beginning.

5       Your Honor, the defendant set it up that way so that

6  he could divert the money from his victims to his mansion.  No

7  matter what hopes he had about Black Diamond.  It was the plan

8  from the beginning.  And no one was ever told the truth about

9  Sovereign Grace, ever.  It was a secret, and he lied in

10  multiple different ways, and multiple different times.  He

11  didn't keep those lies straight.  But the record is absolutely

12  clear about that.  It shows his intentionality.  It shows that

13  just like Keith Simmons, he's calculated from the beginning

14  how he was going to get peoples' money out.

15       Your Honor has also made contrast with Keith

16  Simmons.  He spent the money.  He didn't invest it.  I refer

17  the Court to the one example from Ned Siegel.  It's on the

18  screen.  It's just an example as the Court knows.  Mr. Davey,

19  like Mr. Simmons, spent the money and did not invest it for a

20  long period of time beginning in March; hundreds of thousands

21  of dollars.

22       Mr. Davey says, Well I stopped in September.  First

23  of all, in August he took $200,000 from a charity and told him

24  that he was to use that money only for church planting.  That

25  was the only purpose of that investment.  We showed at trial

1   the agreement Mr. Davey negotiated.  It says right on there

2   those funds were restricted.  They were not able to be

3   removed.  Mr. Davey took that $200,000, made some transfers to

4   his family, putting his brother's seminary as a net winner

5   from the Ponzi scheme.  And then he used the rest of it to pay

6   himself in salary payments and pay his own bills.

7        The government walked through that evidence in

8   detail at the trial.  The bank account shows the money goes

9   into -- by the way, the Court received a letter from Safe

10  Harbor Christian Foundation saying, Hey, we should be a victim

11  too.  This was who Eternal Vision thought they were investing,

12  with Safe Harbor Christian Foundation.

13       They were also the ones, again, remember quite

14  clearly the defendant saying he was the one who came up with

15  the computerized trading platform.  He was the one who figured

16  it out.

17       Mr. Davey took that money, instead of putting it

18  into Safe Harbor Christian Foundation, he put it in Safe

19  Harbor Investment accounts and he spent it making preferential

20  payments to entities associated with his family members, and

21  then just paying his maid, paying his light bill, paying his

22  credit card, making salary payments to himself at a time when

23  he was getting emails from victims saying, I am desperate.

24  They're going to shut off my electricity.  I'm a single woman.

25  And he was getting these emails.  He knew there were hundreds

1  of thousands of dollars of withdrawal requests, and he's

2  paying himself 10 grand a month in fees, and spending money on

3  his mansion.  This is not a man who thought he was doing the

4  right thing.  It's just not.

5        I don't know what was in his head.  But what I know

6  is that he lied and he took money for himself when others were

7  telling him, we put in the documents to prove it at trial, I

8  am desperate.  Defendant says, I stopped in September.  But he

9  kept on taking money, it went into his account from the other

10  hedge fund managers.  And he kept on putting on his website,

11  returns, after returns, after returns, showing how much money

12  everybody was making.

13        So if he's saying, Well, listen, I knew it was bad I

14  stopped taking money in September.  Why did he keep putting it

15  on the website?  Why did he keep taking money from his hedge

16  fund?

17        Remember when he emailed Steve Lacy, when he's

18  telling him he has to pay his bill.  Lacy's saying, I can't do

19  it.  This is in December of 2009.  The defendant says, Listen,

20  that money that's in your cash account, that's available for

21  any purpose you choose, including paying yourself.  And by the

22  way, you have been paying yourself, so pay me.  That's in an

23  email that we introduced at trial, the Court will recall.

24        This defendant engaged in intentional conduct and

25  knew what he was doing.

Your Honor, that is the nature and characteristics of the offense. And it didn't stop after the offense. People asked him questions afterwards, he lied. The paymaster was one of the illusions introduced by Simmons, no doubt, to put people off. The defendant is in a recorded call in January of 2010 telling people "I talked to the paymaster." "I talked to the paymaster" is what the defendant said. I think that was another instance in which he told the Court during trial that he misspoke. There is no misspeaking about, "I talked to the paymaster." Because the paymaster was like the tooth fairy. He didn't exist.

Defendant didn't speak to him. He lied about it. The Court will recall that in the fall when the defendant was really leading things up, the other hedge fund managers who were also guilty, were asking the defendant for some proof the paymaster existed. The defendant used that phrase, "I have received communication from the paymaster." Hedging at that point, but clearly giving the impression that there was a paymaster to back things up.

He went further and talked to the victims and said, I talked to the paymaster. Again, a lie, the defendant knew what he was doing.

The Jonathan Davey that his friends and family knows, is not the whole Jonathan Davey. It's just irrefutable.

1    The seriousness of the offense and just punishment I

2  think are amply shown through the utter devastation that this

3  crime wreaked, not only on the defendant's victims that he

4  solicited personally, but the victims that he told he was an

5  independent accountant auditing the hedge funds for; the

6  victims whose money he took into his bank account; and the

7  victims who he published monthly website statements for.  It

8  was their life savings.

9    In the beginning one can look at that and say, Yeah,

10  it's terrible you lose your life savings.  That's a lot of

11  money.  When you think about it, a life savings is much more

12  than just money.  What a life savings represents is all of the

13  sacrifices one makes over their entire life for that savings.

14  People work overtime.  They miss dinners.  They miss birthday

15  parties.  They scrimp and they save.  They tell their

16  families, no over their whole life about things that they can

17  offer them to make their life better so that they might have

18  those savings.  It's more than money.  It's a lifetime of

19  sacrifice.  Many of those victims, as the Court knows, I'm not

20  going to belabor it because I know the Court has read the

21  letters, are now desperate.

22    It affected the victim's ability to trust.  What

23  this Court saw over and over, is those victims who don't

24  continually believe that the defendant has been wronged by the

25  evil government, have the inability to trust people now.  It

1    has affected their entire outlook on the world.  Marriages

2    have broken up.  Relationships severed from the stress of an

3    event like this.  The Court's read about the victim's physical

4    and mental health views.  One victim lost his faith.  Others

5    simply cannot view the world the way they were raised now.

6    Many cannot go to school.  They lost their money for

7    education.  Some victims have talked about the measure of

8    their dignity and their self worth.

9            I do want to recognize, Your Honor, that there are

10   victims here today.  John Sargent, Lucinda Fincannon, Jim

11   Vasouki (phonetic spelling).  I don't know if any other

12   victims are here today.

13           MR. MURRAY:  Keith and Louise Murray.

14           MR. MEYERS:  Murrays.  The Court has heard from

15   numerous other victims that are simply too broke to make it

16   because of the money that was stolen from them.  I've told

17   these victims that heard through me or through the FBI court

18   services, the Court has carefully read the letters.  Do any of

19   you wish to make a statement to the Court in addition to

20   what's in the letters?

21           MR. SARGENT:  (Indicating.)

22           MR. MEYERS:  Yes, sir.

23           MR. SARGENT:  May I make a quick statement.

24           MR. MEYERS:  You can come forward, sir.  With the

25   Court's permission.

1    THE COURT:  You may.

2    MR. SARGENT:  My name is John Sargent, sir.  I'm one

3    of the victims of Jonathan.  I want to say on his behalf that

4    he did my taxes for years and I never had a problem with the

5    IRS.  So I never had a reason to question his integrity.

6    And secondly the other thing I would like to say is,

7    if the Judge would consider transferring the money that came

8    from Jonathan back to Jonathan's investors, we would certainly

9    appreciate the consideration.

10    THE COURT:  Thank you.

11    MR. SARGENT:  Yes, sir.  Thank you.

12    MR. MEYERS:  So the losses, Your Honor, represent

13    much more than money.  They are life wrecking in many cases,

14    and the Court needs to give a sentence that gives adequate

15    deterrence and protects the public and also promotes respect

16    for the law.

17    The defendant has -- by lying to his victims about

18    the government's sentencing recommendation, by lying to his

19    victims about the percent they should give to probation, about

20    maintaining that the government cares not for justice, has

21    promoted a disrespect for the law, and puts him in a position

22    of a sentence needing to take that into account.

23    Your Honor, I don't believe the defendant deserves

24    the sentence that Keith Simmons did.  We're recommending 20

25    years.  It's half the sentence of Keith Simmons.  It is more

1    than the sentence that Bryan Coats received.  Though Bryan

2    Coats cooperated from the beginning.  Proactively recorded

3    Keith Simmons, and helped the government prepare for the

4    defendant's trial.

5              I ask the Court for a sentence of 20 years.

6              THE COURT:  Thank you.

7              Mr. Davey, if you would please stand.

8              THE DEFENDANT:  (Complies.)

9              THE COURT:  I have read the pleadings in the case,

10   including the victim impact letters, letters of support of

11   Mr. Davey.  I've heard the testimony today.  I've listened to

12   the arguments of the attorneys.  I've consulted the advisory

13   guidelines, reviewed the information in the presentence

14   report, made the advisory guideline rulings that I have.  I

15   recall vividly the testimony in the trial of this matter.  I'm

16   prepared to state a sentence.

17             In doing so I've considered the arguments for

18   variance, both from the government and the defendant.  I've

19   taken into consideration, as I have said, the strong showing

20   of support by family members, friends, family and friends who

21   were -- people who lost money with respect to this fraudulent

22   scheme.  I've taken into consideration the other arguments for

23   departure and variance including the concern for disparate

24   sentencing.

25             And in stating a sentence I'm acknowledging that the

1    letters of support, the testimony on behalf of Mr. Davey have

2    impacted the Court, and allowed the Court to see a side of

3    Mr. Davey that is so difficult to see when you consider the

4    consequences of his criminal conduct over a course of years in

5    this conspiracy.

6           Because I don't believe that this was an unwitting

7    involvement.  The evidence appears to the Court that from the

8    beginning in different ways Mr. Davey lied to people for the

9    purpose of obtaining their money, ultimately to benefit

10   himself.

11          Of course it is the history of any Ponzi scheme that

12   some people in it at the right time received benefits as well,

13   but they received benefit from later victims who lose

14   everything.

15          And it appears to the Court that this was part of

16   Mr. Davey's plan to benefit himself and those close to him.

17   To continue to do that even as the total phantom nature of

18   this conspiracy became evident.

19          And it appears to the Court that Mr. Davey took this

20   fraud and ratcheted it up in ways that none of the other

21   conspirators did.

22          The Court does not want to overemphasize the impact

23   of the Sovereign Grace building of a personal mansion evidence

24   in the case, but it is symbolic to the Court of what it is

25   appears to be going on here.  Despite Mr. Davey's many other

1  good qualities, he appeared to be driven by a greed that the

2  Court rarely sees.  A willingness to avert the eyes to the

3  calamity that his conduct was causing others.

4  The government's description of this criminal

5  conduct as life wrecking in terms of the damage that resulted,

6  I think is very accurate.  Life wrecking in terms of lost life

7  savings, loss of ability to trust, creation of marital

8  problems, loss of faith, sense of dignity, physical and

9  psychological health impairment.

10  All of these things are very real life consequences

11  of the defendant's greed as he engaged in this conduct over

12  time, and then took investor money and put it into his own

13  personal mansion.  Put that money into the mansion in a form

14  that he could later default upon, and then used that as a way

15  of cheating the government out of his fair share of taxes.

16  These are all things unique to Mr. Davey's criminal

17  conduct in this case, and separate from a more culpable, and

18  in many ways heinous -- more heinous than the conduct of other

19  conspirators.

20  It seems to the Court that absent from all of this

21  character support from friends and family, loving friends,

22  loving family, well intentioned, seems absent from their

23  understanding of this criminal conduct is the very real

24  presence of evil in the things that Mr. Davey did.  The very

25  real presence of greed, out of control greed occurring in

multiple different ways, stealing other people's money.

Mischaracterizing it in a way that personally benefits.

Falsely fraudulently filing tax returns. This from a CPA

trained individual.

There are real life consequences to evil, and they

are present in this case. And Mr. Davey is criminally

culpable in causing those consequences.

And so when the Court considers the very

life-affirming, family-affirming support of Mr. Davey, the

Court considers it in context and balances it against the

life-wrecking damage, the greed that appears to motivate the

conduct.

In order to accomplish the purposes of the

sentencing, which include protecting the public from further

crimes of the defendant, deterrence in a difficult to detect

crime like this, retribution and rehabilitation, the Court

considers all of those purposes in light of this evidence, in

light of the absolute inability of the defendant to see his

own role in this criminal conduct.

I understand that he indeed is not innocent. He is

very seriously guilty of fraudulent misrepresentations, money

laundering, tax fraud.

In that context, those purposes of sentencing are

somewhat in tension with each other, and the Court will

attempt to accomplish the 3553(a) purposes and factors set out

1  in Title 18.

2  Pursuant to the Sentencing Reform Act of 1984, it is

3  the judgment of the Court that the Defendant Jonathan D.

4  Davey, is hereby admitted to the custody of the United States

5  Bureau of Prisons, to be imprisoned for a term of 60 months on

6  each of Counts One and Four, and terms of 240 months on each

7  of Counts Two and Three.  All such terms to run concurrently

8  with each other, except for 12 months of Count Four to run

9  consecutive to any other term of imprisonment, for a total

10 term of 252 months.

11 A sentence of 252 months is sufficient but not

12 greater than necessary to accomplish the sentencing objectives

13 of Section 3553(a), including the need for the imposed

14 sentence to reflect the seriousness of the offense, promote

15 respect for the law, just punishment, adequate deterrence, and

16 to protect the public from further crimes of the defendant.

17 It takes into account the very serious nature of

18 this prolonged financial fraud scheme.

19 But it also takes into account the history and

20 characteristics of the defendant, including his lack of a

21 criminal history, and the beautiful letters of support that

22 have been submitted on his behalf.

23 It takes into account, as well, the sentences

24 imposed by this Court and others of similarly situated

25 defendants and attempts to account for the culpability of this

1    defendant, vis-a-vis other people engaged in this jointly

2    undertaken criminal activity.

3            Following the defendant's release from imprisonment,

4    a three-year term of supervised release is ordered on each

5    count to run concurrently.

6            Within 72 hours of release from the custody of the

7    Bureau of Prisons, the defendant shall report in person to the

8    probation office in the district to which he is released, and

9    while on supervised release the defendant shall not commit

10   another federal, state, or local crime, and shall comply with

11   the standard conditions that have been adopted by the Court in

12   the Western District of North Carolina.

13           And shall comply with the following additional

14   conditions:

15           The defendant shall file tax returns with the IRS as

16   required by law, and provide the U.S. Probation Office with

17   proof of the same.

18           The defendant shall cooperate with the IRS to pay

19   all outstanding taxes, interest, and penalty.

20           The defendant shall make restitution as directed to

21   the United States District Court to be paid to the IRS in the

22   amount of $282,800, pursuant to 18 United States Code Section

23   3663.

24           Further ordered that the defendant pay to the United

25   States a special assessment of $400, and that he make

1  restitution to each victim, pursuant to 18, United States Code

2  3663(a) as directed to make those payments to the United

3  States District Court to be paid to the victims in the amounts

4  as set forth in paragraph 87 of the presentence report.

5       Any payment that is not payment in full shall be

6  divided proportionately among the victims named.  And the

7  defendant will be held jointly and severally liable with other

8  participants in this scheme, including but not limited to

9  Jeffrey Toft, Chad Sloat, Michael Murphy, Keith Simmons, James

10 Jordan, Steve Lacy, Roy Scarboro, Jeff Muyers, M-u-y-e-r-s, in

11 their respective cases.

12      The Court gives notice that the liability is joint

13 and several, and that there may be other restitution orders in

14 the future.  The victim's recovery is limited to the amount of

15 their loss, and the defendant's -- this defendant's liability

16 for restitution ceases if and when the victims receive full

17 restitution.

18      In light of the restitution award and special

19 assessment, the Court finds that the defendant does not have

20 the ability to pay a fine or interest, and will waive payment

21 of a fine and interest in this case.

22      The defendant shall forfeit any interest he has in

23 any property seized by the United States in the course of this

24 investigation and prosecution.

25      Payment of the criminal monetary penalty shall be

1    due and payable immediately.

2         The Court has considered the financial and other

3    information contained in the presentence report and finds that

4    the following is feasible:

5         If the defendant is unable to pay any monetary

6    penalty immediately, then during the period of imprisonment,

7    payment shall be made through the Federal Bureau of Prisons

8    Inmate Financial Responsibility Program.

9         Upon release from imprisonment, any remaining

10   balance shall be made in monthly installments of no less than

11   $200 to be commence within 60 days until paid in full.

12        Throughout the period of supervision, the probation

13   officer shall monitor the defendant's economic circumstances

14   and report to the Court with recommendations as warranted, any

15   material changes that affect his ability to pay any court

16   ordered penalty.

17        A sentence of 252 months is a departure or a

18   variance from the otherwise applicable advisory guidelines

19   designed by the Court to be the sufficient but not greater

20   than necessary sentence to accomplish the sentencing

21   objectives of 3553(a).  And any departure or variance from the

22   otherwise applicable guideline range, based upon the

23   government's recommendation of a variance motion, and the

24   evidence presented by the defendant in the form of -- lack of

25   a criminal history, family and community support, is so

1    apparent in this case, and the desire of the Court to avoid

2    any disparate sentencing in this matter.

3         The sentence of 252 months is the sufficient but not

4    greater than necessary sentence that the Court chooses in this

5    case with full consideration of all the grounds for variance

6    and departure, whether expressly indicated by the Court or not

7    in this proceeding.

8         A sentence of 252 months is, again, the sufficient

9    but not greater than necessary sentence chosen by the Court,

10   regardless of the specific counts of conviction with respect

11   to fraud and money laundering.

12        It is the intention of the Court, that even without

13   a money laundering conviction, the Court would have chosen a

14   sentence of 252 months as the sufficient but not greater than

15   necessary sentence in this case.

16        Other than what I've -- what we've already

17   discussed, is there any reason why the sentence should not be

18   imposed as stated?

19        MS. McVAY:  No, Your Honor.

20        MR. MEYERS:  No, Your Honor.

21        THE COURT:  Let the sentence be imposed.

22        Mr. Davey, you can appeal your conviction if you

23   believe there's some defect in these proceedings.  You also

24   have a right to appeal your sentence under certain

25   circumstances, particularly if you think the sentence is

1   contrary to law.  Any notice of appeal must be filed within 14

2   days from the entry of judgment.  And if you are unable to pay

3   the cost of an appeal, you may apply for leave to appeal with

4   no cost to you.  And if you request, the Clerk of Court will

5   prepare and file a notice of appeal on your behalf.

6           I recommend that you talk to your attorney about

7   these appeal rights, but do you understand these rights as the

8   Court has just explained them to you?

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  Very well.  What is the government's

11  position with respect to self reporting?

12          MR. MEYERS:  Your Honor, the defendant has been

13  compliant with his bond conditions and has substantial family

14  ties.  Nevertheless he is 50 years old and he has been given a

15  sentence of 21 years.  That presents an unacceptable risk of

16  flight, particularly given the defendant's facility with

17  international places such as Belize.  I think it would be

18  irresponsible of me not to recommend that the defendant be

19  detained.  I informed his counsel prior to this hearing that

20  we would be asking for that matter.  I hope that he's made

21  sufficient preparations.

22          MS. McVAY:  Your Honor, may we be heard?

23          THE COURT:  Yes.

24          MS. McVAY:  Mr. Meyers told me he would be asking he

25  be detained if the sentence was substantial.  With regard to

1    ties to Belize, I think even the testimony at trial was that

2    Mr. Davey has never been to Belize.  He has reported.  He's

3    made every phone call.  He's done everything that's necessary

4    to make all his appearances.  We're asking that he continue to

5    remain report -- be able to self report.  And we're also

6    asking that the Court designate a location close to his home

7    in Ohio, a prison location of Morganton?

8               THE COURT:  Morganton, Ohio?

9               MS. McVAY:  Morgantown, West Virginia.

10              THE COURT:  Morgantown, West Virginia.  I'll make

11   that recommendation to the Bureau of Prisons as part of the

12   judgment.

13              It is the recommendation from the Court that the

14   Bureau of Prisons is free to accept that recommendation or

15   not, depending upon the needs of the Federal Bureau of

16   Prisons, but I certainly will make -- I will recommend that

17   Mr. Davey be designated to a facility in Morgantown, West

18   Virginia as part of the judgment.

19              With respect to the issue of self reporting, 18,

20   United States Code, Section 3148 instructs that the Court

21   should take into consideration the concern with flight risk,

22   based on the factors set forth in Section 3142.

23              The Court has serious concern, as it has previously

24   stated, with respect to Mr. Davey's view of reality.  The

25   Court believes that the evidence of intentional fraudulent

criminal activity was particularly strong in this case.

Mr. Davey has an absolute right to test that, constitutional

right to a jury trial, and a right to make allocution as he

sees fit.  And the Court in no way wants to interfere with or

chill those rights.

        The Court is convinced that Mr. Davey's view of

reality is skewed.  The Court considered the government's

exhibit, Sentencing Exhibit No. 1.  Declined to impose a

enhancement based upon that conduct, but that exhibit

concerns -- confirms in the Court's mind the impaired

understanding of reality that Mr. Simmons has, and his

willingness to encourage others to engage in conduct

detrimental to themselves for his own personal benefit.

        There is evidence in this case of the formation of

overseas corporations with the purpose of avoiding auditing

and other purposes inconsistent with the Court's confidence

that the defendant would continue to abide by conditions or

combination of conditions of release.

        For all of those reasons the Court believes that

pursuant to 3143, and considering the self-reporting of a

person who has been found guilty of an offense and sentenced

to a term of imprisonment, that the Court would have to be

convinced by clear and convincing evidence that the person is

not likely to flee or pose a danger to the safety of any other

person or the community if released.

1       This sentence imposes a very substantial sentence on

2  the defendant.  The defendant has shown his ability to

3  establish international connections as I've indicated.

4  Amassed a large amount of money in the course of the offense.

5  And though assets have been seized, the Court is not

6  completely sure that all money has been accounted for.

7       The Court's own assessment of the defendant is that

8  he has an impaired view of reality.

9       For all of those reasons, the Court believes that

10  the defendant has not shown by clear and convincing evidence

11  that he is not a flight risk.  The Court will remand Mr. Davey

12  at this time to the custody of the United States Marshals.

13       Anything further from either side?

14       MR. MEYERS:  Yes, Your Honor.  I have one additional

15  issue.  There is $3.3 million that is now available to

16  distribute to victims.  We had asked the Court for a writ of

17  execution in the Keith Simmons case, which is docket 104 in

18  3:10-23, for the Court to use that writ of execution on that

19  $3.3 million, based on the undisputed evidence that it came

20  from Black Diamond, to place it into the Simmons restitution

21  fund and distribute it immediately, tomorrow, to victims.  So

22  we're asking the Court to do that first.

23       If the Court declines to do that, we're asking the

24  defendant when he files his notice of appeal, not to appeal

25  the restitution.  I hope that won't be necessary.  I hope the

1   Court will issue the writ of execution.

2           If the defendant appeals his restitution, then that

3   $3.3 million and the Court does not do this, will sit and will

4   be unable to be distributed until his appeal is over.

5           So I have a two-part request; one for the Court and

6   one for the defendant.  I hope that I will not have to ask the

7   defendant to do that.

8           THE COURT:  What is the authority of the Court to

9   issue the writ of execution in light of the almost certain

10  appeal that will follow in this case?

11          MR. MEYERS:  That the Court can find that the

12  Keith -- that the money is money that belonged to Black

13  Diamond, and was in the possession of Keith Simmons and Black

14  Diamond.  The Court has found that case.  The Court has the

15  ability under the Federal Debt Collection Procedures Act,

16  which is referenced in 28 U.S.C. Section 3001, and 28 U.S.C.,

17  specifically 3203 to issue writ of execution on funds.

18          Now I understand that the defendant may have an

19  argument that that $3.3 million should go only to DCS victims.

20  I believe that that argument can be overcome by the

21  defendant's admission in court pleadings, that that money

22  stemmed from Black Diamond.

23          In other words, the defendant withdrew that $4

24  million sent it to Amkel.  That $3.3 million is recovered from

25  that.

1          And so I'm asking the Court to do it on the basis of

2    that undisputed factual issue.  And I don't know if the Court

3    has had time to fully consider that pleading, because it was

4    filed in the Simmons case, which is the appropriate place to

5    file it.  I understand the defendant objects to that.

6          If not, I'm asking the defendant -- I'm frankly

7    asking in front of his victims, and in front of his friends

8    and family.  If the Court declines to do that, I'd ask the

9    Court to consider that.  I'd ask the defendant not to appeal

10   the restitution.  Because if he appeals it, they're not

11   getting paid until that appeal period is over.

12         That's my request to both the Court, and in the

13   alternative to the defendant.

14         THE COURT:  Ms. McVay, what says the defendant?

15         MS. McVAY:  Your Honor, from my understanding, the

16   government did not put a forfeiture count in this case.  So we

17   object to any argument about forfeiture of money in this

18   proceeding.

19         Additionally Mr. Davey wants me to appeal his case.

20         Additionally, there is a civil case pending in which

21   there is an argument as to the true identity of the funds.

22   And of course Mr. Davey's victims would like the money,

23   $3.6 million distributed to them, which is a small pool of

24   people versus 250 people.  That's one of the main reasons he

25   could go to trial so that the money could go back to his

1   victims.

2       THE COURT:  Mr. Meyers, put your request for a writ

3   of execution in writing.  How much time would you need to do

4   that?

5       MR. MEYERS:  We've done that already, Your Honor.

6       THE COURT:  In this case?

7       MR. MEYERS:  Not in this case, Your Honor.  So it is

8   filed in the Simmons case, which is 3:10-23 and it's document

9   104 in that case.  We filed it November 21st.

10      MS. McVAY:  I filed an objection to it.

11      THE COURT:  November 21st --

12      MR. MEYERS:  Of 2014, Your Honor.

13      THE COURT:  Your objection is on record?

14      MS. McVAY:  Yes, I entered into that case and filed

15  an objection.

16      THE COURT:  I'll get an order out -- if it's teed up

17  by the filing of a motion, objected to by counsel, I'll review

18  those pleadings and get an order out by the end of next week.

19      MR. MEYERS:  Your Honor, Mr. Odulio informs me that

20  Judge Keesler was assigned that as a matter of course.  He has

21  issued that writ.  So I would want to amend my request for the

22  Court to affirm that ruling if it is appealed to this court.

23      THE COURT:  I'll treat Ms. McVay's objection, as an

24  objection to the action of the magistrate judge, and I'll

25  review it and get a decision out by the end of next week.

1    MR. MEYERS:  Thank you, sir.

2    MS. McVAY:  And, Your Honor, just for purposes of

3  the record.  I want to renew my request for a bond pending

4  appeal under the same factors that you just addressed.

5    THE COURT:  Very well.  You have that for the record

6  and it is denied.

7    This matter is concluded.  Mr. Davey is remanded at

8  this time.

9    (The matter is concluded at 11:44 a.m.)

10    (End of Proceedings.)

11    * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF OFFICIAL REPORTER

     I, Laura Andersen, Federal Official Court Reporter, in
and for the United States District Court for the Western
District of North Carolina, do hereby certify that pursuant to
Section 753, Title 28, United States Code that the foregoing
is a true and correct transcript of the stenographically
reported proceedings held in the above-entitled matter and
that the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

     Dated this the 16th day of May, 2015.




                         S/Laura Andersen
                         Laura Andersen, RMR
                         Federal Official Court Reporter